```
            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                   JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

        Plaintiff,               Case No. 3:09-cr-387-J-32MCR

vs.                              September 30, 2010

ROBERT ALLAN COWAN,             11:24 a.m.

        Defendant.               Courtroom No. 10D
_____


                  CRIMINAL STATUS CONFERENCE
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                 UNITED STATES DISTRICT JUDGE

GOVERNMENT COUNSEL:


        D. RODNEY BROWN, ESQ.
        United States Attorney's Office
        300 North Hogan Street, Suite 700
        Jacksonville, Florida  32202

DEFENSE COUNSEL:


        CHARLES L. TRUNCALE, ESQ.
        Law Office of Charles L. Truncale, P.A.
        233 East Bay Street, Suite 1101
        Jacksonville, Florida 32202

COURT REPORTER:


        Shannon M. Bishop, RMR, CRR
        221 North Hogan Street, #150
        Jacksonville, Florida 32202
        Telephone:  (904)549-1307  Fax:  (904)301-6844
        dsmabishop@yahoo.com


(Proceedings reported by microprocessor stenography;
transcript produced by computer.)
```

1                    P R O C E E D I N G S

2  September 30, 2010                        11:24 a.m.

3                        - - -

4           COURT SECURITY OFFICER:  All rise.  This Honorable

5  Court is now in session.  Please be seated.

6           THE COURT:  Good morning.  I apologize for having

7  to run late this morning.  I had a conference that I had to

8  attend by necessity.

9           This is the case of *United States versus Cowan,*

10 3:09-cr-387.  Mr. Brown represents the government.

11 Mr. Truncale represents Mr. Cowan, who's present in the

12 courtroom.  We're here today at my request for a second

13 status conference in this case.

14          The history is that we had a status last week -- I

15 believe it was last week.  When was it, Mari?

16          MR. TRUNCALE:  It was Thursday, Your Honor,

17 Wednesday or Thursday.

18          COURTROOM DEPUTY:  Last Wednesday.

19          THE COURT:  What's the date?

20          COURTROOM DEPUTY:  The 22nd.

21          THE COURT:  September 22nd.  And at that time

22 the -- we found out from the government what its current

23 thinking was as to how it intended to proceed in the case.

24          And what it -- what it told me at the time was

25 that the government's present intention was not to call the

1  child as a witness and, also, not to call two inmates who

2  were apparently prepared to testify about various statements

3  that Mr. Cowan had allegedly made to them.

4          And so that put aside for the moment one set of

5  potential issues that we were going to have to be having to

6  talk about.

7          The government did tell me, however, that it did

8  intend to call a child care worker by the name of Carol

9  Crumpton and also a DCF agent to, in some manner, testify

10  about communications they had received from the child during

11  the course of the investigation that then led the government

12  to seek a search warrant and to search the computers of

13  Mr. Cowan, which -- and I think, also, maybe a phone.

14          And the question was debated at the last status

15  conference whether the potential testimony of the

16  caseworker, care worker -- child care worker, Ms. Crumpton,

17  and of the DCF officer raised hearsay or confrontation

18  clause problems.

19          And then there was a third issue, which was

20  whether the government's effort to play the tape of its

21  interview with Mr. Cowan raised any evidentiary problems.

22  So that's what I went back to look at.

23          The parties indicated to me -- at least

24  Mr. Truncale did, I know, and I didn't know whether

25  Mr. Brown would or not, that they might provide me with

1  authority on these matters.  I don't think I've received

2  any.

3         So we researched these issues ourselves as best we

4  could, not maybe knowing precisely what we were looking for,

5  but having a general idea.  And so I do have some tentative

6  thoughts on it.  But before I do that, I want to talk to the

7  parties and see if we're in the same place we were.

8         I also want to address -- and maybe I'll go ahead

9  and do this now, because it potentially could bear on some

10  of the issues that -- that I'm working with now to try to

11  get us in a place where everybody at least tentatively knows

12  what evidence is going to be admissible, what evidence may

13  not be admissible, so that we can position ourselves to be

14  ready to go to trial on Monday.

15         Mr. Brown, could you give me a brief statement as

16  to the enticement issue in this case?  As I understand it,

17  Counts Four and Five are these enticement counts under -- I

18  believe it's 2251(a), if I'm correct.

19         And we've had these cases with you before.  But,

20  of course, in all those cases we had direct evidence of

21  enticement, really, coming from -- from the defendants

22  themselves in the form of these interviews -- you know, in

23  the form of the chats and so forth.

24         I'm trying to understand -- or trying to start to

25  think about -- how is the government -- if they're not going

1  to have a victim -- the alleged victim testify, how is the

2  government proving enticement in this case?

3          MR. BROWN:  Well, Your Honor, the statute 22 --

4  Section 2251(a) uses the term entice.  But it also uses the

5  term employ, use, persuade, induce, and coerce.  And we've

6  charged it in the conjunctive.  But, of course, we're

7  allowed to prove it in the disjunctive.

8          This is not an enticement case like the court has

9  seen previously and -- for example, in *United States versus*

10 *Deal,* where you have a series of chat logs and, you know, an

11 undercover in one location and a defendant in another

12 location and trying to lure a child, essentially, to -- for

13 sex.

14         In this case, what Mr. Cowan did was he used his

15 child to produce images that were sexually explicit.  And

16 the United States will offer into evidence not only the

17 images themselves, which speak for themselves, I would

18 argue --

19         THE COURT:  Do they?  And that's what I -- I mean,

20 how is the jury going to know who the child is when they see

21 these images?

22         MR. BROWN:  Because the child will be identified

23 by several witnesses --

24         THE COURT:  Okay.

25         MR. BROWN:  -- including the ex-spouse of the

1    defendant.  Moreover, the, I guess, direct or circumstantial

2    proof will be that Mr. Cowan had custody of that child on

3    that particular day during that particular time period.

4          And when Mr. Cowan produced these images,

5    fortunately for us, unfortunately for him, the iPhone

6    captured not only the exact time and date of the images, but

7    also captured the GPS location of where the images were

8    taken.  And so the United States will offer into evidence

9    that.

10          And, in addition, the United States will offer

11   into evidence a message and a photograph that Mr. Cowan sent

12   from his iPhone to his then wife, now former wife's, iPhone

13   that was minutes before the images in question -- that is,

14   the pornographic images -- were taken.

15          So it's our position we can easily prove beyond a

16   reasonable doubt that Mr. Cowan used and otherwise

17   persuaded, enticed, coerced, because, again, the child in

18   question is four years old.

19          THE COURT:  Right.

20          MR. BROWN:  And our position is that the images

21   speak for themselves.

22          THE COURT:  And are you saying that witnesses will

23   identify the child off of the pictures?

24          MR. BROWN:  That's correct.

25          THE COURT:  Okay.  And my other question with

1  respect to that count -- and I understand the use, because I

2  looked at some law.  Mr. Marques helped me look at some law

3  that indicated that that's one of the ways you can prove

4  this count.  I just wanted to make sure I had an

5  understanding.  And I'm not ruling on anything that I'm not

6  being asked to at the moment.  But I just wanted to get a

7  better sense of that.

8          The other question I had was -- Counts Four and

9  Five -- if I'm reading it correctly, the crime charged is

10 the same.  The date is the same.  And the only thing that

11 appears to be different are the actual images themselves.

12 And what are -- what is the reason for the separateness of

13 those two counts?

14         MR. BROWN:  The reason for the separateness, in

15 addition to being different images, is that they're a

16 different class of images.  The images which are set forth

17 in Count Four were captured or produced by Mr. Cowan of the

18 child in the car.  The child is in a car seat, et cetera.

19 And we have the dates and -- or the times exactly.  And

20 we'll introduce that into evidence.

21         With regard to Count Five, the second class -- or

22 classification of images, those were taken by Mr. Cowan in

23 his own residence.  And so that's why we made a decision to

24 separate those like that.

25         THE COURT:  And I assume there's a separation of

1  time, obviously, if it's in the car and in the house; is

2  that correct?

3          MR. BROWN:  That's correct.  It is very brief, as

4  in minutes.

5          THE COURT:  Okay.  All right.  Are you about in

6  the same place you were a week ago when we talked about how

7  the government would like to proceed in terms of the

8  testimony of Ms. Crumpton and of the DCF agent?

9          MR. BROWN:  Yes, Your Honor, with some

10  clarification.  And I apologize if I -- if I wasn't as

11  clear.  What we pledged is that we did not intend to call

12  the child in our case in chief or the two jailhouse

13  informants, if you will, in our case in chief.

14          THE COURT:  Right.

15          MR. BROWN:  And, of course, we don't know what

16  case the defendant is going to put on.  And so we'll make a

17  decision about rebuttal at that time.

18          And, of course, our decision to do that was an

19  effort to streamline the case, not only for the court but

20  also, primarily, for the victim.

21          With regard to how I see our case in chief, our

22  wish is to introduce as our first witness Ms. Crumpton, to

23  testify with regard to the statements that she heard the

24  child make which began this entire investigation and

25  prosecution.

1              With regard to the DCF worker, what more likely we

2    will -- what more likely we will do is call Detective Baker

3    with regard to -- not statements that the child made during

4    the interview -- and I presume the court has seen parts, if

5    not all of it --

6              THE COURT:  Yes.

7              MR. BROWN:  -- and I --

8              THE COURT:  I mean, I have -- let me -- I have not

9    seen it.  I've been briefed on it.  I have -- I have read --

10   and my -- my own personal self, I've read the statement from

11   the DCF -- or from the child care worker, Ms. Crumpton, and

12   I have actually read the transcript of the interview of

13   Mr. Cowan with the police officers.

14             I have not looked at the tape of the child yet.

15   Mr. Marques has and told me essentially what's on it.  But I

16   need to do that myself.  But I just haven't had time to do

17   that myself yet.  Just so everybody knows where I am.

18             MR. BROWN:  Yes, Your Honor.  Well, let me be

19   clear about that.  We don't intend to introduce that video

20   recording of the child's interview.  We do not intend to

21   introduce evidence through any testimony of the statements

22   that the child made during that interview.

23             The only thing that we wish to introduce was the

24   fact that the child was observed during that interview

25   making gestures which simulated oral sex.  It was a

1 four-year-old child.  And so the implication of that is

2 obvious, I think, to everyone.

3        We looked into that -- I looked into and tried to

4 do some research on that.  Because I had told the court --

5 and I fully believe that it's not hearsay.  And, really, not

6 so much a verbal act, but more of one witness testifying as

7 to what that witness saw a person -- what action that person

8 took.

9        And I -- and I was able to -- and when I say I,

10 what I mean -- I mean that in the sense that my very smart

11 law intern was able to find a case.  And I'll just cite it

12 for the court.  It's *United States versus Short*,

13 790 F.2d 464.  And it's a Sixth Circuit case.

14        And in that case -- apparently, over on page 466,

15 it looks like, it talks about how the district court had

16 admitted certain testimony about -- from a witness who was

17 able to testify that this witness saw the victim in the case

18 making -- exhibiting behavior while playing with

19 anatomically correct dolls, which indicated -- and I quote

20 from the case.  And this is on page 467, quote, Farmer's

21 testimony -- that's the witness -- about Diana's conduct,

22 which is the victim, was admitted to support the inferences

23 that Diana, a three-year-old, had knowledge of oral sex with

24 a man and had engaged in oral sex, the act that her mother

25 is charged with abetting.

1        Quote, and this is a quote inside the quote,

2   Ordinarily experience usually suffices without controversy

3   to tell us whether the inference to be drawn from the

4   conduct is at least a fairly possible one, and, therefore,

5   whether the evidence is admissible.  And that's a cite to

6   *Wigmore on Evidence*.

7        It goes on to say, quote, Ordinary evidence

8   suggests that Diana would not have engaged in this conduct

9   absent some similar prior experience.  The sincerity of her

10  conduct is not a danger.  Her memory and perception are not

11  the problem.  And it goes on from there.

12       It says -- it concludes that it's not a particular

13  danger of -- is not a particular danger of hearsay.  Under

14  these circumstances, we hold that Farmer's testimony as to

15  Diana's conduct was not hearsay.

16       Your Honor, that's the best that we can do.  But I

17  think that's persuasive in this case.  And I would commit

18  that to the court's review.

19       So, essentially, what we're doing, Your Honor, is

20  we're limiting our presentation to just with regard to what

21  the child communicated or demonstrated, if you will, to the

22  statements that were made initially to Carol Crumpton and

23  then the gestures that were observed during the interview.

24       With regard to the statements that were -- that

25  were made to Ms. Crumpton, our position is that they're not

1  hearsay.  And we submit them to the court, because,

2  essentially, that statement that I gave you, which is the --

3  and I, of course, provided it to counsel, which is her

4  statement, is pretty detailed, as you can see.

5          And the court -- and I'll be candid with the

6  court.  The court may wish to limit the statement in some

7  fashion.

8          In other words, the court may find, candidly, that

9  it's -- in its entirety it's extremely overly improperly

10  prejudicial.  But there are certain -- at the beginning of

11  it, there are certain statements that we think that should

12  be admitted to show why Carol Crumpton then talked to Joyce

13  Owens and why she called the DCF worker and why the DCF

14  folks called Larry Baker with the Jacksonville sex crimes

15  division.

16          So, you know, one of the things that we're -- that

17  we wanted to do was -- if the court was going to limit us in

18  some way, that we would have some idea as to what that limit

19  was, so that we could advise our witnesses appropriately.

20          THE COURT:  Right.

21          MR. BROWN:  With regard to that statement, I did

22  find a few cases late yesterday.  And when I say I, once

23  again, I mean assisted by our law intern.

24          It's our position that that statement is not --

25  that those statements by the child are not hearsay and,

1   therefore, they don't implicate *Crawford*.  They're certainly

2   not testimonial in nature.  They're not made to a law

3   enforcement officer.  And there are a few cases that we

4   found wherein *Crawford* -- essentially, *Crawford,* the court

5   uses pointed phraseology which essentially details what kind

6   of statements would be considered testimonial.

7          Specifically, the court says that a formal

8   statement made by an accuser to a government official would

9   qualify as testimonial, as would a statement that an

10  objective witness would reasonably believe -- would be used

11  in future court proceedings, while a casual remark to an

12  acquaintance would not be considered testimonial.  And

13  that's out of *Crawford* at -- I think it's 541 United States,

14  at 51.

15         There's a Sixth Circuit case that says that the --

16  it's *United States versus Franklin,* 415 F.3d 537, at 545 and

17  546.  It's a 2005 case.

18         It says, quote, The threshold question in this

19  case is whether the declarant's statements to the witness

20  were testimonial.  It is clear they were not.  The declarant

21  made the statement to his friend by happenstance.  And then

22  it goes on to talk about it wasn't made through a law

23  enforcement officer, et cetera, et cetera.

24         And in this case what you have is you have a

25  child, a four-year-old child, making statements to a day

1   care worker which are spontaneous and out of left field, if

2   you will.

3          The hearer is not a law enforcement officer.  The

4   declarant, the child, the victim -- clearly, a four-year-old

5   cannot be considered to have been making statements in

6   anticipation of any type of litigation or any type of future

7   court proceeding.

8          Moreover, they're not hearsay.  So they're not

9   hearsay and they're not testimonial.  And we're offering

10  them for the purpose of showing what happened after that and

11  why people took this very seriously and why a search

12  warrant -- search warrants were obtained, et cetera.

13         THE COURT:  All right.  Well, let me -- I hear

14  you.  And let me -- let me try to give you some of the

15  benefit of what we've done.  And let me preface this by

16  saying that I think the government's efforts to limit the

17  evidence of the molestation, and I think the government's

18  efforts not to require the victim to testify are perfectly

19  appropriate.

20         I also think the government isn't required to try

21  an unnecessarily antiseptic case.  In other words, I think

22  the government ought to be allowed to give some context to

23  what it did.  I mean, in theory, you could prove your case

24  without any of this.

25         I mean, you don't -- you don't really need any of

1  this.  You need the fact that there was a search warrant and

2  they found this and you go from there to prove your case.

3       But I don't -- I don't think the government is

4  required to cleanse their case or scrub their case to the

5  point where it doesn't -- it doesn't allow the jury to have

6  some context in mind.

7       And so I'm sympathetic to some accommodation that

8  allows the government to do that, but I -- but I am worried

9  about hearsay.  I am worried about confrontation clause.

10  And I want to make sure that whatever I let you do is

11  something that you're allowed to do.

12       And so here's some of the things that are

13  concerning to me.  You know, if this was a 414 case, other

14  acts of child molestation, certainly the child would be

15  testifying and the -- whatever other evidence you were able

16  to muster on that point would be able to come in and be

17  evaluated.

18       But even under 414, according to the cases we're

19  looking at -- and I recognize that's not exactly what you're

20  saying.  I'm going to get to what you're saying in a moment.

21  But even under 414, the case law we're looking at, such as

22  *Carino,* which is an Eleventh Circuit case, 368 Fed.Appx.

23  929, that just came out, it says that you have to meet the

24  other provisions of the federal rules of evidence, even

25  under Rule 414, which means that you have to meet the

1  hearsay rule.  You have to -- you can't introduce hearsay in

2  414 just because it's 414.

3           And so we looked at some cases where the child's

4  hearsay statement of prior sexual abuse had been admitted,

5  but only where it met a hearsay exception and so forth.  And

6  then there's also *Crawford* issues.

7           I think I agree with you that -- the statement to

8  the day care worker I don't think presents a *Crawford*

9  problem.  The statements made to law enforcement or a DCF

10 agent I think are much more problematic under a *Crawford*

11 analysis.

12          MR. BROWN:  And just to say, we're not seeking to

13 introduce those statements, Your Honor.

14          THE COURT:  I understand.  All right.  So that was

15 our concern.  Even if you overlay 414 on to this, it doesn't

16 get you out of having to worry about something being

17 hearsay.  It doesn't get you out of worrying about whether

18 something is -- has a *Crawford* problem.

19          So that was the first thing that we kind of looked

20 at.  The second thing we looked at was more, I think, what

21 you're saying, which is that this is -- this is being

22 admitted for, essentially, the backdrop or background that

23 led to the events that -- that caused the agents to get the

24 warrant and then to go from there.

25          And there is case law that talks about allowing

1  the government to present the whole story of the misconduct

2  to place it in proper perspective in order to guard against

3  the jury having to ask why was this momentous decision made

4  and not having context.

5          And so that -- I understand that.  But, again, the

6  cases we're reading say that even in that context hearsay is

7  still an issue.  And there is a -- and you're saying it's

8  not really offered for the truth of the matter.  That's

9  okay.

10         But it still has to be relevant and probative of

11  the issues in the case.  And we're looking at a case from

12  the Eleventh Circuit called *Arbolaez*, A-r-b-o-l-a-e-z,

13  450 F.3d 1283.

14         And in that case the district court had admitted

15  the statements of a codefendant that were offered not for

16  their truth but to explain why the agents had done what they

17  did.

18         And the Eleventh Circuit noted that it was clear

19  that the district court allowed the statements in as

20  nonhearsay pursuant to 801(c).  So the court decided it

21  wasn't hearsay.  It was offered for a different purpose.

22  Similar to what you're trying to do here.

23         But the court said that even when it was

24  purportedly not admitted for its truthfulness, but to show

25  why the agent did what he did, it still constitutes an

1  admissible hearsay.  The court went on to say that even a

2  court's preadmission warning or other limiting instruction

3  is insufficient to remove the statement from the realm of

4  hearsay or to preclude the jury from considering the

5  statement.

6           Ultimately the court found it was harmless error,

7  but it was still error.  And the court also intimated there

8  might be a confrontation clause problem.

9           So I'm sympathetic to trying to allow the

10 government to put on the case that it wants to put on.  I

11 appreciate the limitations the government has already put on

12 its case.

13          I just want to make sure that I'm not going to run

14 afoul of these issues.  And those are the very issues that

15 Mr. Truncale raised the other day.

16          And, you know, I'm willing to be persuaded that

17 this type of evidence is okay, but I'm reading cases in

18 which it tells me that sometimes it's not okay, even for

19 background, or even if it's offered for a different purpose.

20          And I looked at whether it was inextricably

21 intertwined.  But I don't think this -- that quite works

22 either.

23          And so I'm just -- you know, I'm not ruling at

24 all.  I'm not saying what I'm going to do.  I'm just raising

25 some issues with you.  I'm also concerned -- I did read the

1  entire transcript of Mr. Cowan's interview with the police.

2  And I'm having a hard time seeing what that has to do with

3  this case.

4       I mean, the only time he was ever asked about

5  pornography he said, Let me have a lawyer.  He said, No, and

6  then, Let me have a lawyer.

7       Those are my concerns.  And let's talk about that

8  for a minute.  Let me hear from Mr. Truncale.  I'm not sure

9  what I'm going to do exactly.  But I just want -- since the

10 government is the proponent of this, and since the

11 government -- I mean, another way to do this -- you know,

12 I'm not suggesting this is what you should do.  I'm not

13 suggesting you should back off.

14      What I am saying to you, another way to do this

15 would be to call Ms. Crumpton and say -- after you do

16 whatever else you do, What happened on this day?  Well, on

17 this day the victim came to me and she said some very

18 disturbing things about her father.  And based upon that, I

19 called this person.  And this person -- the DCF person gets

20 on the stand and says, Based on our interview with the

21 child, we were very concerned and, therefore, we got a

22 search warrant and there we go.

23      And I don't -- that's another way to do it.  And,

24 you know, I'm not telling you how to try your case.

25 Ultimately, I'm going to have to rule on the admissibility

1  of evidence as it comes, but I just am -- I do have some

2  concern.  And I sure as heck don't want to do this twice,

3  so...

4           MR. BROWN:  I understand, Your Honor.  And I

5  appreciate the court -- the court's advice.  And, in fact,

6  the United States will make it very easy for everyone.  And

7  that is, if the court will allow me to -- through that first

8  witness, to -- after telling who she is and what she does,

9  et cetera, allow me to elicit testimony with regard to --

10 and, again, not -- and, again, I recognize that this is a --

11 this is graphic detail here.

12          And I did not come up here thinking that the --

13 that the court -- that you were going to allow all that in.

14 I'm just providing everything that we have.  And then we can

15 talk about, you know, what the court will allow.

16          But if the court will allow me to elicit testimony

17 from this lady that the child made statements with -- that

18 gave her concern that she was being sexually abused by her

19 father, and so, therefore, I did this, then we can make this

20 very easy.  I think we would -- we would withdraw any other

21 efforts to get the more detailed substantive things in here.

22          And if I can, Your Honor, just a few more

23 *Crawford* --

24          THE COURT:  Yeah.

25          MR. BROWN:  -- just a few more *Crawford* cases.

1            THE COURT:  Sure.  Well, as I said, I don't --

2  right now -- and I'm going to hear from Mr. Truncale.  And

3  he's, I'm sure, patiently waiting over there.  But I don't

4  really have a huge *Crawford* concern with the day care

5  worker.

6            I mean, I don't -- that clearly was not in any

7  environment in which anybody could say it was going to be

8  testimonial.  I think when you start talking to the DCF

9  agent you get into a different place.

10           And so I don't -- if you're trying to get me to

11  agree with you that the statements to the child care worker

12  were not *Crawford*, I think I already agree with you on that.

13           MR. BROWN:  All right.  And with regard to the

14  other -- the statements that come -- that would come from

15  either the DCF worker or the detective that observed the

16  child's interview -- again, just to be clear, we're not

17  seeking to elicit any statements that the child made

18  verbally.

19           We're only simply trying to introduce that --

20  evidence of that gesture.  And I think I submitted what I

21  think is our best -- our best case on that that I could

22  find.  And -- are there any other issues?

23           THE COURT:  Yeah.  Just address briefly.  Why --

24  are you intending to play the tape of the interview with the

25  defendant?  And, if so, what's it probative of in this case?

1 As I read it -- well, I'll let you talk, not me.  What are

2 your -- what are your thoughts about that interview?

3            MR. BROWN:  Well, Your Honor, of course, it tells

4 part of the story, why the officers did what they did.  And

5 I understand -- and I gave the court the entire -- and I

6 gave Mr. Truncale the entire interview.  And I apologize

7 there were -- I noticed there were a few spacing issues,

8 et cetera.

9            But, in any event, the -- our position is that it

10 shows not only why -- why we are all here, but it also

11 contains statements that I think are inculpatory, as well as

12 exculpatory.  And I could see a situation where, if we

13 didn't use it in our case in chief, it might be used against

14 us in the defendant's case and then we would have to come

15 back around.

16            THE COURT:  Well, that's legitimate.  I mean, if

17 Mr. Truncale tells me they want to play this thing, then

18 I -- then, of course, we're not going to have any problem.

19 If he tells me they're going to stay 100 miles away from it,

20 then -- then I don't know where we are.

21            Let me -- let me just say to you while I'm

22 thinking of it, whatever rulings I make and whatever

23 limitations I make, or that you agree to, I understand that

24 depending upon the case the defendants put on, we may be

25 talking about a whole lot of things in rebuttal.

1          And rulings I make as to what you might be able to

2     do or not do or limitations you place on yourself in your

3     case in chief -- depending on what defense Mr. Cowan puts

4     on, those limitations may no longer make sense.

5          And I'm perfectly willing to understand that I may

6     have to revisit a lot of these limitations, depending on the

7     evidence that -- that he puts on.  But go ahead.

8          MR. BROWN:  Well, Your Honor, the court has had

9     the benefit of reading the transcript.  And there are

10    exculpatory utterances that are in there.  It's our position

11    that there are also inculpatory statements that are made, as

12    well.

13         And when I say inculpatory -- like, for example,

14    when he's asked about pornography and he says, I don't do

15    porn, he lied, because he did do porn.  We found child

16    pornography on his computer media.  And so, therefore,

17    that's -- even though -- it is inculpatory to -- when

18    considered with the other evidence.  Our position is that.

19         THE COURT:  I guess my problem with the rest of it

20    was it was all about molestation.  It was all about -- you

21    can even hear the -- the tape of the child talking, because

22    I guess he was playing the -- the detective was playing the

23    tape for him.

24         I haven't actually watched the tape of the

25    interview, but I'm told by Mr. Marques you can actually hear

1  the child talking.  And then the officer, in effect, says,

2  Well, what about that?  And I just think you're opening a

3  big can of worms if you try to play all that.

4          And that was what 98 percent of the interview was

5  about.  They only got to porn at the very, very end.  And

6  that came up kind of sideways.  He didn't even ask him about

7  child porn.  He just said, What about porn?  And the

8  effort -- the reason for asking that question was to

9  establish whether or not there was any way that this young

10  girl could have possibly been exposed to the types of

11  terminology and activities that she was recounting other

12  than because she was telling the truth.

13          And, you know, maybe we could -- and I'm just

14  thinking out loud.  Maybe if you wanted to play that little

15  piece where he says, What about porn, and he says, I don't

16  do porn, maybe I'm -- you know, maybe that would be okay.

17  I'm just really concerned about rolling tape on this thing

18  and having a discussion which I assume lasted about an hour

19  all about molestation when that's not what this case is

20  about.  And that's my concern.

21          MR. BROWN:  May I have just a moment, Your Honor?

22          THE COURT:  Sure.  I tell you what, why don't you

23  let me talk to Mr. Truncale and then you can come back and

24  we'll figure this out.  All right?  Thanks.

25          Mr. Truncale?

1          MR. TRUNCALE:  Yes.  Thank you, Your Honor.  If I

2    could just start with -- with my position on the interview

3    of Mr. Cowan, because, to me, I think that would -- that's

4    the simplest one to deal with.

5          My concerns are that notwithstanding a valid

6    purpose for admission that's been presented by the

7    government, to give the context of what was happening in the

8    course of getting a search warrant and arresting him, that

9    is not enough to overcome the undue prejudice.

10          We are, again, about 98 percent -- more than that,

11    98, 99 percent of the interview is about sexual abuse, and

12    specifically oral sex between the child and -- and

13    Mr. Cowan.

14          There is no -- to me, the probative value is still

15    outweighed by the undue prejudice.  This is a case of

16    possession and receipt --

17          THE COURT:  Mr. Brown says he's worried that if he

18    doesn't use the tape you're going to use it against him

19    somehow.  Is that a valid thing to be worried about?

20          MR. TRUNCALE:  No, Your Honor.  No.  Absolutely

21    not.

22          THE COURT:  Do you have any intention of using any

23    part of that tape in your defense?

24          MR. TRUNCALE:  Absolutely not.  We are completely

25    staying away from the issue of child molestation.  And

1  here's where it is so unduly prejudicial to us.

2      There are possession counts of -- possession of

3  child pornography in interstate commerce, receipt of child

4  pornography in interstate commerce.

5      The actual visual depictions that are going to be

6  admitted are repulsive, clearly repulsive.  They're not

7  based on lascivious exhibition of genitals, which is like

8  the least of the harm.  It's about sexual activity and --

9  but it has nothing to do with the defendant or any acts he

10  took, other than possessing and receiving the visual

11  depictions.

12      THE COURT:  And I have not yet seen -- I know I'll

13  have to.  But I have not yet seen the depictions of the --

14  of the child in this case.

15      MR. TRUNCALE:  Okay.

16      THE COURT:  How are they characterized?

17      MR. TRUNCALE:  And that's what I was going to

18  bring out.  I would say the evidence of the visual

19  depictions concerning the child are -- are nowhere near -- I

20  wouldn't even use the word repulsive, whereas I would on the

21  other.

22      There is an explanation -- an explanation that

23  he's going to give to them to say -- what it is is

24  there's -- there's photos of a -- of a naked child, a series

25  of them, about 15 or so, while she's in the bedroom.  She

1   had just taken a bath or a shower.  And she's naked.  And

2   in all -- in each and every depiction, her legs are spread

3   apart.  You can see her -- her genitals.  You can see her

4   pubic area.

5          But it's our position that it is not the dominant

6   focus of the picture.  It's -- and that's what we're going

7   to be saying.  And it's like you have pictures of children

8   naked in a bath, or literally on their stomach, and pictures

9   of the child -- of children.  This is not uncommon that you

10  will see that and their buttocks will show.  But I would

11  submit that that wouldn't be child porn, because the --

12          THE COURT:  So you're saying --

13          MR. TRUNCALE:  -- at least an argument -- we have

14  a legitimate argument for those.  They are so different.

15          THE COURT:  So you're saying Mr. Cowan's position

16  will be that the photographs or the depictions of the child

17  are different in kind from the other child pornography that

18  was found?

19          MR. TRUNCALE:  Oh, absolutely, Your Honor.

20          THE COURT:  Okay.  And that that is something he

21  believed to be meaningful and that he intends to put forward

22  to the jury?

23          MR. TRUNCALE:  And that is exactly his primary

24  defense.  It's almost his entire defense on those charges.

25  We do not have much of a defense on the others.  But on the

1  use counts, Four and Five --

2          THE COURT:  That's --

3          MR. TRUNCALE:  -- the -- the pictures help us as

4  much as they hurt us.

5          THE COURT:  So let's get back to these

6  statements -- the statement in the police station.  Your

7  position is -- the position -- your position with respect to

8  Mr. Cowan's interview with the police is what?

9          MR. TRUNCALE:  Is that it's not relevant to the

10 issues in this case.  The issue in this case is whether he

11 received, possessed, or in a sui generis type of a situation

12 took pictures of his child.  It's not a case of sexual

13 abuse.

14          And if it goes into that juncture, I -- I believe

15 there -- it will cause irreparable harm.  We will not get

16 over the prejudice.  And there's no relevant -- if the court

17 accepts that -- well, yeah, or it could -- in a vacuum, it

18 would be relevant that a person who has child pornography or

19 produced it would use it in connection with sexual activity

20 of -- with a minor.  Yeah.  That's probative.

21          But it's unbelievably overwhelmingly outweighed by

22 the prejudice that that alone will guarantee a conviction if

23 the other evidence didn't.

24          He has a fighting chance on these counts.  And

25 the -- the evidence of -- the evidence of sexual activity is

1  being tried in the Duval County court.  That's where it

2  should be tried.  It should be tried in its entirety there.

3  It's -- it's too prejudicial to be tried here.  And I submit

4  that the case is over if their interview is in.

5           Also, in the parts of that tape where the child's

6  statements are played, that, in effect, transforms,

7  certainly, the child's statements into testimonial

8  statements, because they're given to -- they're being

9  given -- you know, in a sense that the police are using them

10 as such.

11          THE COURT:  Okay.  I think I understand your

12 position on the statement.  Now, Mr. Brown has -- in a

13 continuing effort to meet the issues that have been raised,

14 he's now trimmed back further his proposal as to how he will

15 proceed with the child care worker.  I'm not sure I got

16 exactly what he intended to do with the DCF agent.  But you

17 heard what he said.

18          MR. TRUNCALE:  I did.

19          THE COURT:  What is your position on that?

20          MR. TRUNCALE:  Very simply, even -- even with the

21 suggestion of -- we spoke with her.  She provided

22 information of sexual abuse.  And that's why we took our

23 actions.  I -- I submit that sexual abuse, either explicit

24 or given to the jury's imagination, bringing in sexual abuse

25 as -- as the overarching reason for their actions is unduly

1  prejudicial.  I would -- I would pose an objection to that.

2  I will acknowledge that that is the least --

3          THE COURT:  You've come a long way, right?

4          MR. TRUNCALE:  Yeah.  That is --

5          THE COURT:  And I guess my concern -- and that's

6  what I was trying to tell Mr. Brown.  You know, I am

7  reluctant to tell the government you have to make this --

8  you have to, in effect, create a scenario that really wasn't

9  exactly what happened.

10         You have to pretend or you have to so clean it up

11 that -- that you're, in effect, requiring people to give a

12 version of events which is not exactly the way it happened.

13         Now, I know in many trials we don't admit certain

14 things and they're not admissible.  And there's reasons for

15 that.  On the other hand, there comes a point where people

16 ought to be able to tell enough of their story so that their

17 story makes sense and that the government's case makes

18 sense.

19         And the -- the conundrum I have is that the thing

20 that triggered this is the very thing that is so prejudicial

21 to begin with.  And how do I decide that?  And what do I do?

22 And that's where the -- the conundrum is.

23         MR. TRUNCALE:  Your Honor, I can tell you if -- if

24 all we heard was there were allegations of -- or concern

25 about sexual abuse, on that I don't think I would even have

1  him -- I would suggest to Mr. Brown -- Mr. Cowan not to even

2  respond to that.  And I would argue to the jury that that's

3  not -- you know, we're here on this and try to focus on it.

4        I don't want to do anything to make it a part of

5  the trial.  That seems to be the -- if the court is going to

6  allow context, that would certainly --

7        THE COURT:  Well, the only other thing I could do

8  would be to even make it a little more sanitized, that there

9  were allegations of sexual misconduct, for example, as

10 opposed to abuse, or that she -- they -- she said something

11 very disturbing of a sexual nature involving her father.

12 But, I mean, it's all about the same thing.  And Mr. Brown's

13 offer, I think, is maybe pretty reasonable.

14        MR. TRUNCALE:  Yeah.  Can I speak with my client

15 about that?

16        THE COURT:  Yeah.

17        MR. TRUNCALE:  Because I was -- this has just come

18 up.

19        (Counsel confers with defendant.)

20        MR. TRUNCALE:  Your Honor, the -- I can say this,

21 that if something like that came in, we are not going into

22 it.  We're not going to delve into anything other than the

23 fact is he's caught with child pornography and in various

24 forms, very egregious forms, and a not-so-egregious form.

25        No, we're -- we're going to do everything in our

 1   power to ensure that there will be no rebuttal.  And if he

 2   doesn't do that, I don't have a problem -- when Mr. Brown

 3   cross-examines him, I don't -- I --

 4            THE COURT:  Well, the scope of the

 5   cross-examination will depend upon the scope of the direct.

 6            MR. TRUNCALE:  Correct.

 7            THE COURT:  So --

 8            MR. TRUNCALE:  I have control of that.

 9            THE COURT:  And so, I mean, obviously, there's

10   reasonable leeway given to the government.  But I know

11   Mr. Brown is very sensitive to this issue.  And if he feels

12   like he's going to ask a question that's potentially

13   problematic, he's going to ask me about it beforehand.  So

14   I'm not worried about that.  Because the last thing we want

15   is a mistrial.

16            MR. TRUNCALE:  I honestly believe that if it came

17   out something to that effect, I -- I believe that a -- an

18   objection on undue prejudice would be probably overcome on

19   that, because -- because, yes, the police are going to think

20   that just by the nature of the persons involved.

21            But there's one other piece of evidence that --

22   that I know will be of a contention.  And it's -- again, if

23   there is any demonstration of what the child is alleging

24   that to have --

25            THE COURT:  I understand.  I was just going to ask

1  you about that.

2          MR. TRUNCALE:  Yeah.  I -- here's the way I see

3  it.  I don't know how you can get around hearsay -- I don't

4  know how the government can get around hearsay, because

5  if -- if they just say, We spoke to this girl and she, in

6  the course of the conversation, exhibited the following

7  conduct, that conduct would have no relevance.  There would

8  be no relevance for bringing in that conduct, other than for

9  them to say -- and with regard to hearsay statements, we

10 asked her to show us what her -- what her father did or what

11 she did with her father.

12          That would give probative value to the -- to the

13 demonstration, but that would be hearsay.  And what that

14 would mean is -- is the worst of all of the most -- that's

15 even more prejudicial than the statement of the accused.

16          THE COURT:  Okay.  Thank you.

17          Mr. Brown, I think that -- I think that the

18 government's proposal as to how to proceed with the child

19 care worker is probably as reasonable a proposal -- and, you

20 know, you could even be more clinical about it.  But I don't

21 think you're required to.  And I think the government has

22 made efforts to -- to comply with the concerns that I had

23 regarding inadmissible hearsay and confrontation clause

24 issues.

25          I mean, you do have to be able to -- to show that

1  there was a -- a consistent and concerning series of events

2  that caused the -- the activities that -- that eventually

3  led to the search warrant.  And I -- I mean, I think --

4  whether you have to do that or not, I think you're entitled

5  to do that.

6        And so I think -- I think your proposal is -- is

7  reasonable.  And if the child care worker says something to

8  the effect that -- that I -- you know, I was -- you know,

9  I -- I mean, I think -- I think you can, you know, do the

10 setup, I mean, who she is and that the child voluntarily

11 came up to her and that based on that conversation and so

12 forth -- I think you can -- you know, you can put a little

13 meat on the bones.

14       But if the bottom line is that -- is that -- from

15 that conversation from the victim that she -- there was --

16 there was -- she was concerned about possible sexual

17 misconduct or abuse by the father and that led her to act,

18 I'll permit that, and -- but that's about all I want out of

19 that.  And so if you will instruct your witness accordingly,

20 I think that will be fine.

21       MR. BROWN:  And, candidly, Your Honor, that will

22 be a lot easier on the witness.  Because, as you imagine,

23 this is not a law enforcement witness or a professional

24 witness or a person who's ever testified before.

25       This is a person who deals with children every

1 day.  And this was probably one of the most upsetting events

2 of her adult life.  So I appreciate the court's ruling.  And

3 I will, of course, comply with it.

4         THE COURT:  Okay.  And, now, with respect to this

5 agent, I'm -- I'm concerned.  You know, why wouldn't it

6 be -- why wouldn't it be better to do something similar with

7 the agent, as opposed to having the agent demonstrate what

8 the gesture was?

9         MR. BROWN:  Well, Your Honor, if the court would

10 allow us to present testimony through the agent,

11 essentially, that he observed the child -- in other words,

12 do it -- because, candidly, I hadn't -- I intend on calling

13 Detective Baker for this, I think.  I'm pretty sure.  I had

14 not intended on having him demonstrate it, for so many

15 reasons.

16         THE COURT:  Right.

17         MR. BROWN:  But if the court will allow me to

18 elicit that testimony, that he observed in response to some

19 of the questions that the child demonstrated or simulated

20 oral sex, we would leave it at that.

21         THE COURT:  I guess what the problem is, how --

22 how does that not then create all the same hearsay and other

23 confrontation clause problems?  Because that's, in effect --

24 I mean, in effect, is it any different than Detective Baker

25 getting up on the stand and saying, And then the girl told

1  me that her father performed oral sex on her?  How is it any

2  different?

3          And why -- why is it not a better course to say --

4  just like you did with the child care worker, to say

5  something like, We interviewed the girl after -- after the

6  child care worker brought this to our attention and, based

7  upon the things that she said in the interview, we had

8  reason to be concerned about sexual misconduct or sexual

9  abuse on the part of her father and, therefore, we

10 instituted the measures that we did and here's where we are?

11 Why would that not be good enough and -- without getting us

12 into these potentially troubled waters?

13         MR. BROWN:  I understand that, Your Honor.  And

14 can the United States take that under advisement?

15         THE COURT:  Why don't you think about that.  Okay?

16         MR. BROWN:  Thank you.

17         THE COURT:  Think about that.  And we'll -- you

18 know, because we're -- we're pretty close -- I mean, we're

19 either going to do it the way you said or we're going to do

20 it the way I just suggested.  And so that little tweak we

21 can -- we can address on Monday.

22         I mean, you can think about it.  Think about if

23 you -- if you really feel like that -- that you need to have

24 that or you want to have it the way you want to have it,

25 I'll make a ruling on it.  I mean, I'm not -- I'm not saying

 1  no right now.  I'm just thinking it through and making --

 2  you know, for all the reasons.  You understand what I'm

 3  doing?

 4          MR. BROWN:  I do understand, Your Honor.  And if

 5  you'll just give me until the morning of trial, I can so

 6  instruct our witnesses.

 7          THE COURT:  Okay.  And, Mr. Truncale, if -- if

 8  that's -- if something along the lines that I suggested is

 9  the government's final position with respect to the DCF

10  agent, what would your position be on that?

11          MR. TRUNCALE:  We would -- my position is that

12  the -- we would proceed without objection.

13          THE COURT:  Okay.  Okay.  So we know -- we know --

14  now we've got that little thing right in a box and we just

15  need to get it -- get it decided.

16          And where are you, Mr. Brown, on the interview,

17  the police interview?

18          MR. BROWN:  Well, Your Honor, I hear what the

19  court has said.  And I certainly hear what learned counsel

20  has said.  And I mean that not sarcastically, but I've known

21  Mr. Truncale for a long time, and he's a very smart lawyer.

22          I certainly see the potentiality for danger here.

23  And as I was sitting thinking about it, I was thinking that

24  one of my concerns is to be put into a box if and when the

25  defendant takes the stand, which appears to be likely in

1 this case, perhaps more likely than any other case.  Totally

2 his decision.  He's welcome to do it.  He's welcome not to

3 do it.  Personally, I don't care.  But I'd like to be

4 prepared for that eventuality if it happens.

5          MR. TRUNCALE:  Your Honor, he will testify.

6          And, Mr. Brown, he is going to the testify at

7 trial.

8          MR. BROWN:  Well, there you go.

9          THE COURT:  Okay.

10         MR. BROWN:  So in light of that, I don't want to

11 be boxed in by not having evidence of the interview in -- or

12 in our case in chief.  But what I was thinking as the court

13 was talking was -- and I certainly understand.

14         First of all, the backdrop here is that 414 says

15 that evidence of child molestation is admissible in a case

16 involving an offense of child molestation.

17         And so it -- I think everybody here agrees that

18 we're trying cases of -- offenses of child molestation, by

19 the rule's definition, even though it is different than a

20 sexual contact.

21         So -- so that having been said, Rule 414 provides

22 for that propensity evidence.  And the case law, I think, is

23 clear on that.  And I know we've cited it to the court.

24         So with that as the backdrop, our position is

25 evidence of the sexual molestation -- or the child

 1  molestation is admissible, assuming, as the court said, it

 2  fulfills all the other requirements, hearsay and 404 -- or,

 3  excuse me, 403, which *Carino* apparently says 403 applies to

 4  the 414 analysis, or vice versa.

 5          But with that as the backdrop, I was thinking that

 6  maybe the way to allay the court's concerns is rather than

 7  playing the interview is to simply ask the detective

 8  questions about his interview with Mr. Cowan; that is, it

 9  allows us to avoid essentially chopping up the interview by

10  excising the parts where the video is played of the child's

11  interview.

12          It allows us to ask certain questions which I

13  think are interesting and to have the detective describe

14  Mr. Cowan's demeanor, which I can't think of a better term

15  than creepy at this point, having reviewed the tape many

16  times.

17          And it allows us to avoid some of the more

18  gratuitous comments by the detective, who did a good job in

19  the interview.  But it allows us to avoid that.

20          And I'm just sort of thinking about that.  That --

21  that means, essentially, that the interview -- the recording

22  and the transcript of the interview would only come in on

23  rebuttal or in cross-examination of the defendant.

24          THE COURT:  Okay.

25          MR. BROWN:  And that's sort of what I was

1  thinking, Your Honor.

2          THE COURT:  Well, of course, I guess it would

3  depend -- as a concept, I don't have any problem with that,

4  because you're entitled to ask the detective anything you're

5  entitled to ask him.  And I suppose statements made by

6  Mr. Cowan are admissions, and so it's -- you know, even if

7  they're denials by him.  But it all depends on which

8  questions you would ask him.

9          MR. BROWN:  Of course.  Of course.

10          THE COURT:  And so we just have -- you know, I'm

11  not going to preclude you from -- from, you know, asking him

12  questions about the statement.  And it's just going to be --

13  it's just going to be what you're going to get into.

14          But one thing that we've got to be careful of is

15  you can't -- you know, you can't throw -- lob a grenade in

16  there before Mr. Truncale knows what you're going to say and

17  then all of a sudden, Objection, and then we've got a big

18  hoo-ha.

19          So we're going to have to think about that.  And

20  why don't you think about it.  And, you know, you -- you can

21  either -- the government can either seek the introduction of

22  the tape and I'll rule on that.  The government can -- in

23  its case in chief.

24          All of these rulings are case in chief.  I don't

25  know what I'm going to allow in rebuttal, because I don't

1   know what I'm going to hear.

2          But the government can seek to get in some of the

3   same evidence through the detective.  And depending on the

4   questions the government asked, that will be fine or

5   objectionable.  But to the extent the government is going to

6   ask the detective -- or thinks it wants to ask the detective

7   questions that the government knows or has reason to believe

8   might be controversial, we're going to have to do that

9   outside the presence of the jury and do a proffer, or do

10  something so that everybody knows what's going to happen,

11  and we go from there.

12          MR. BROWN:  Well, you know, Your Honor,

13  absolutely.  We certainly don't want to, you know -- you

14  know, the United States is not interested in sneaking

15  anything in.

16          THE COURT:  I understand.  The only reason I'm

17  saying that, Mr. Brown, is that -- and I know you're not

18  trying to do that.  But when I read that transcript, there's

19  not a whole lot there except, you know, Didn't you do this,

20  and here's -- and, you know -- and so there is a -- a

21  limited amount I think you're going to be able to do.

22          And I don't know that 414 helps you very much,

23  because -- I don't think we can -- I think the whole point

24  of this is that with the victim not coming in and saying,

25  Here's what happened to me -- and I understand why she's

1  not.  But without her doing that, I have to be careful not

2  to let you just try that case without actually having that

3  witness do it.

4          And so those are my concerns.  Why don't you think

5  about it.  And we'll talk about it again on Monday and see

6  where we are.  And if you have something else you want to

7  say, I'm...

8          MR. BROWN:  Lots, Your Honor, but not today.  I

9  appreciate the court's allowing us the opportunity -- and it

10  may just be -- what I'm going to do is I'm going to confer

11  with the case agent who couldn't be here because he had a

12  medical issue.  I'm going to confer with Detective Baker.

13  Probably bounce it around with my colleagues as well.  And

14  I'll talk to Mr. Truncale about it.  And there may very well

15  be.  But, again, as I've said before, cross-examination and

16  rebuttal, it's going to be open season.

17          THE COURT:  Okay.

18          MR. TRUNCALE:  Your Honor, thank you.  We've made

19  great progress here.  Our position is just simple.

20          THE COURT:  Okay.  Well -- and I want to be clear

21  with you, Mr. Truncale, and with Mr. Cowan.  You know, I'm

22  doing the best I can to -- and I know -- and I appreciate

23  the government's efforts.

24          I'm doing the best I can to give Mr. Cowan a fair

25  trial.  But a fair trial doesn't mean one in which all of

1 the prejudicial evidence against the defendant doesn't come

2 in.

3          So there's going to be evidence -- and I'm

4 going -- and I'm going to allow the government to -- I'm not

5 going to require the government to tie -- to try its case

6 with one hand tied behind its back.

7          And I'm going to let the government try its case.

8 And if the evidence is admissible and if I don't think

9 it's -- under 403 that I should exclude it, I'm going to

10 admit it.

11          On the other hand, I'm not going to admit evidence

12 where I'm concerned there's error or where I feel like --

13 that we're getting into areas that we don't need to get into

14 and now we've caused another problem here.

15          Because at bottom, this is a child pornography

16 case.  It is not a sexual molestation case.  And so I'm

17 going to keep that in mind, as well.  And I think we have

18 made progress.

19          But I don't want that progress that you're

20 referencing be understood as meaning that every time the

21 government wants to do something I'm going to say no,

22 because that's not the way it's going to be.

23          MR. TRUNCALE:  I suspect that, Your Honor.  It has

24 to be fair to the government as well as the defendant.  And

25 we respect that.

1          THE COURT:  And, of course, you know, the

2    dynamic -- and Mr. Cowan is perfectly well-advised.  As you

3    know in the Eleventh Circuit, the court does not make any

4    inquiry about whether or not the defendant is going to

5    testify or not.  That's totally between you and him.

6          But you've announced that he's going to testify.

7    And he knows, I'm sure, based on your discussions with him,

8    that when you put yourself on the stand and you raise your

9    right hand and you swear to tell the truth and you get to

10   ask him all the questions you want to ask him, that the

11   government is entitled to a vigorous cross-examination.

12         And I don't know where that's going to lead,

13   because I don't know what -- I don't know what he's going to

14   say.  But I -- I'm not going to, again -- I'm not going to

15   require Mr. Brown to -- to not be able to use legitimate

16   cross-examination.  And if that leads to legitimate

17   rebuttal, I'll look at it at that time.

18         But I think we have made progress.  I think we --

19   the government is going to consider -- we already know what

20   we're going to do with the day care worker.  The government

21   is going to consider its position with respect to the DCF

22   agent.

23         The statement -- the police department or the --

24   the police interview is still at issue.  And the government

25   is considering its options there.  And we can talk about

1  that.  And that's where we are, right?  And I think those

2  were the issues.

3         And are there any other issues, Mr. Truncale, that

4  you can think of at the moment?  We do have -- we did make

5  arrangements -- Mr. Brown and his colleagues were in here

6  earlier this week.

7         I believe we have a system set up that will allow

8  those -- only those people who need to see these images to

9  see them.  Mr. Truncale, I think we're going to have the

10 monitor on that back table there and turn it around so that

11 you-all will have it right there, and -- but we're not going

12 to put it on the front screen there, because then the

13 audience could see it.

14        Mr. Brown will have it available to him at the

15 podium.  The jury will have it available.  I'll have it

16 available.  And that's all we need.  And -- because we don't

17 need -- we don't need that.  So I think we've got a system

18 set up that will work.

19        The other thing is I am going to need to

20 individually interview each of these jurors, both as to

21 publicity and as to the sensitivities of this situation, and

22 whether they're going to be suitable jurors in a case like

23 this.  And so I probably will do something similar -- I've

24 done it once before with Mr. Brown at sidebar.  I know Judge

25 Howard does it in open court with the podium.  I'm going to

1 figure out -- we may even do it in the robing room.  I'm not

2 sure.

3        But that may -- that may make voir dire take a

4 little longer than it usually will, but so be it.  I'm also

5 bringing in a few more jurors than I normally have, because

6 we lost quite a few -- the last time I tried a case of a

7 similar nature to this, we lost quite a few jurors for

8 cause.  And so I'm bringing in a higher number of jurors.

9 So that means it may well be that selection will take longer

10 than it typically does.  So we need to be prepared for that.

11        But I also am anticipating that both the

12 government and Mr. Truncale will give their opening

13 statements on Monday.  And I will ask the government to be

14 prepared to bring in its first -- at least first few

15 witnesses so that we don't waste any time on Monday.

16        MR. TRUNCALE:  Your Honor --

17        THE COURT:  Yeah.

18        MR. TRUNCALE:  -- just in response to were there

19 any other questions, I didn't get my voir dire and jury

20 instructions in yet, but I did have a reason.  I wanted to

21 see what the government provided.

22        I'm just going to ask for -- maybe just changes to

23 theirs.  There's one that I know that I'm going to object

24 to.  I can file my objections to that tonight.  And that --

25 but, otherwise, I'm going to agree with theirs.

1              And then there's just a few voir dire questions

2    that I thought would be added to the government's, such as,

3    you know, with the fact that he -- that his position as

4    assistant principal of an elementary school and guidance

5    counselor of an elementary and middle school -- something to

6    the effect of, would that fact alone affect, you know, your

7    ability to judge fairly on child porn charges.

8              THE COURT:  Okay.  Well, I'll look at whatever

9    Mr. Brown has sent in.  I'll look at whatever you send in.

10             MR. TRUNCALE:  Mine are going to be very limited

11   in addition.

12             THE COURT:  That's fine.  And we'll be working on

13   that, of course.  And I'm going to ask my traditional voir

14   dire.  I'd hoped to perhaps have a questionnaire, but that

15   didn't -- I just didn't have time to do it.

16             So I'm going to do it the way we always do it,

17   which is that we'll do it in open court.  We'll get to know

18   the jurors a little bit in terms of their occupations and so

19   forth.  I'll ask them as many questions as I can in open

20   court.  And then we'll just do an individual voir dire with

21   each prospective juror on both pretrial publicity and any

22   sensitivities they -- particular sensitivities they have

23   because of the nature of the case.

24             In the past we lost quite a few people because

25   either they'd had some incident of sexual abuse in their

1  past or they had some particular sensitivity that made them

2  say that they couldn't sit in a case like this.  And so I

3  need to explore that with them.

4          And the only way -- the best way to do it that I

5  know of is to do it individually and in as private an

6  environment as we're able to give, given the context of an

7  open trial.  So I'll probably be doing something along those

8  lines.

9          MR. TRUNCALE:  One juror is going to be out here

10  and the others in --

11          THE COURT:  I'm not really sure yet.  When I did

12  it with Mr. Brown, we just called them up to sidebar.  And

13  that worked okay.  I've done it in the robing room before.

14  That worked okay, too.

15          Judge Howard brings them out, I think.  She has

16  them in the jury room, brings them out to the podium.  I

17  want to think about that.  I don't know if that makes them

18  more nervous standing up at a podium like that.  I don't

19  know.  I'm going to talk to Judge Howard and see why she did

20  it that way.

21          And, Mr. Brown, I guess you've been through

22  both -- both of those ways, sidebar and the podium.  Did

23  either one strike you as working better, or not?  I have no

24  pride of authorship, so...

25          MR. BROWN:  Well, then I vote for Judge Howard.

1  No.  I'm kidding.  I -- I think both were effective.  I

2  would say probably the downside to the up-close-and-personal

3  way is that sometimes -- I mean, these people have never met

4  us before.  And, you know, being at point-blank range

5  talking about such issues --

6            THE COURT:  Right.

7            MR. BROWN:  -- might be problematic -- or might be

8  not preferable.  On the other hand, you know, when you're

9  back here, you're speaking to the room, even though it's --

10 there are very few people in it, that might be intimidating,

11 as well.  So it's hard to see -- I mean, if I were the

12 juror, candidly, I'd probably prefer being at the podium,

13 because there's a lot of space between me and the judge and

14 the lawyers.  But both work.

15           THE COURT:  All right.  I'll think about it.

16           All right.  Any other issues, Mr. Truncale, that

17 you can think of?

18           MR. TRUNCALE:  No, Your Honor.

19           THE COURT:  Mr. Brown?

20           MR. BROWN:  No, Your Honor.

21           THE COURT:  All right.  Here's what we're going to

22 do.

23           Mari, is there anything else?

24           (Judge confers with courtroom deputy.)

25           THE COURT:  Let's all be in place at 9 o'clock.  I

1  will come down.  My experience is that we usually have

2  half-hour, 45 minutes before the voir dire is actually --

3  the venire is actually ready.  They make them come in at

4  quarter to eight.  But it takes a long time.

5         And so we will have about a half hour or so to

6  finalize our discussion on the matters we've had, take up

7  any other issues that have arisen.  Then we'll adjourn.  And

8  as soon as the venire is in place, we'll come back out and

9  we'll start picking the jury.

10        If it takes a long time, this may be one of the

11 few situations where I have to declare a lunch break before

12 we actually have the jury in place.  But if I do, I do.  It

13 will take as long as it takes.

14        You know, I think we're pretty efficient about how

15 we do it, but this is a -- these are more difficult cases to

16 pick and we do have more people involved.  So I can't

17 predict how long it will take.  I suppose -- are y'all

18 invoking the rule?  Is that right?

19        MR. BROWN:  Yes, Your Honor, except we would

20 request the case agent exception.

21        THE COURT:  All right.  I'll --

22        MR. TRUNCALE:  I have no objection to that.

23        THE COURT:  I'll invoke the rule.  So you'll

24 instruct your witnesses accordingly.  And the case agent

25 exception will be invoked.

```
 1          Who is your case agent?

 2          MR. BROWN:  James Greenmun, ICE Senior Special

 3 Agent.

 4          THE COURT:  Okay.  Anything else?

 5          MR. BROWN:  No, Your Honor.

 6          MR. TRUNCALE:  No, Your Honor.

 7          THE COURT:  Thanks everybody for your work.

 8          COURT SECURITY OFFICER:  All rise.

 9          (The proceedings concluded at 12:36 p.m.)

10                          - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## **CERTIFICATE**

UNITED STATES DISTRICT COURT )
                              )
MIDDLE DISTRICT OF FLORIDA    )


          I hereby certify that the foregoing transcript is

a true and correct computer-aided transcription of my

stenotype notes taken at the time and place indicated

herein.


          DATED this 16th day of December 2010.




           s/Shannon M. Bishop
          Shannon M. Bishop, RMR, CRR